**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **KATHELEEN FONTI, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | **Civil Action No. 13-4231 (ES) (JAD)** |
| | : | |
| **v.** | : | **OPINION** |
| | : | |
| **HEALTH PROFESSIONALS AND** | : | |
| **ALLIED EMPLOYEES, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

SALAS, DISTRICT JUDGE

In many respects, this case is a straightforward ERISA action. Plaintiffs are current or previous members of a health care labor union called Health Professionals and Allied Employees (the "Union" or "HPAE"). Plaintiffs brought this action against their Union and their Union's president, Hannah Twomey ("Twomey") (together, "Defendants"), alleging that Defendants made material misstatements or omissions about a retirement healthcare benefits plan (the "RHBP," "proposed plan," "plan," or "retirement plan") before Union members voted on the plan.[1]

In other ways, however, this case involves allegations of romance, corruption, and abuse of power. Plaintiffs allege that Twomey—who lives rent-free at a property owned by attorney Richard Loccke ("Loccke")—has awarded, on a no-bid basis, virtually all of the Union's legal work to Loccke. This relationship, Plaintiffs allege, has given rise to a real and apparent conflict between Twomey's personal interests and those of the Union's. In fact, lead Plaintiff Kathleen

---

[1] The Union and Twomey are the only remaining Defendants in this action. The parties stipulated to the dismissal of Defendants Health Professionals & Allied Employees AFT/AFL-CIO, Retiree Medical Trust, Christine O'Hearn, Michael Slott, Joan Johnson, and Benserco, Inc. (D.E. Nos. 70, 193, 194, 195 & 203).

Fonti ("Fonti") created a website called "Boss Twomey's Family" and a Facebook page entitled "Nurses Against Union Abuse" to highlight the alleged conflict of interest. These Internet sites are the subject of Twomey's counterclaim for defamation. (*See* D.E. No. 62, ("Counterclaim") at 15-21).

This case also involves Meadowlands Hospital, a nonparty to this litigation but an entity certainly relevant to Plaintiffs' allegations. In August 2012, the Union filed multiple unfair labor practices charges against Meadowlands Hospital. In October 2013, the National Labor Relations Board ("NLRB"), based on these charges, initiated an administrative action against Meadowlands Hospital. Approximately three months later, Meadowlands Hospital wrote a $25,000 check so that Plaintiffs could retain new counsel in this action against the Union and Twomey. And when Plaintiffs retained new counsel, that new counsel asserted a new count against Twomey: breach of fiduciary duty under the Labor-Management Reporting and Disclosure Act ("LMRDA").

The parties each moved for summary judgment. Defendants move for summary judgment on Counts III and IV of the Second Amended Complaint (D.E. No. 51, ("SAC")). (D.E. No. 183). Plaintiffs Fonti, Anne Picogna ("Picogna"), Adrian Rojas ("Rojas"), Judith Freemantle ("Freemantle"), and Linda Hegarty ("Hegarty") (collectively, "Plaintiffs") move for summary judgment on Count IV. (D.E. No. 174). Fonti also moves separately for summary judgment on Twomey's Counterclaim. (D.E. No. 173).

Having considered the submissions in support of and in opposition to the parties' motions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P 78(b). For the reasons set forth below, the Court GRANTS Defendants' motion for summary judgment on Counts III and IV, DENIES Plaintiffs' motion for summary judgment on Count IV as moot, and RESERVES its

determination of Fonti's motion for summary judgment on Twomey's Counterclaim pending submission of the parties' supplemental briefing.

## I.   BACKGROUND[2]

### A.  Key Players

*Plaintiffs.*  Picogna, Rojas, Freemantle, and Hegarty are health care employees of Palisades General Hospital and members of and represented by the Union for purposes of collective bargaining.  (D.E. No. 176, ("Defs. SMF") ¶ 2).  Fonti, a former employee of Palisades General Hospital, was a member and president of a HPAE local union, representing registered nurses employed at that hospital from 2005 until 2009.  (D.E. No. 176-5, Ex. 5(a) ("Fonti Dep. 1") at 17:5-8, 125:25-126:5).  In 2009, Fonti resigned from the Union, but continued to pay Union dues as a *Beck* objector.[3]  (*Id.* at 152:4-23).  In September 2014, she was terminated from Palisades Medical Center and began working as a manager of Intensive Care at Meadowlands Hospital.  (*Id.* at 8:22, 10:6-10).

*Defendants.*  The Union is a labor organization representing nurses and other healthcare employees in a number of healthcare institutions, including Palisades General Hospital and Meadowlands Hospital.  (Defs. SMF ¶ 1).  Twomey has served as president of the Union since 1974, except for a two-year gap between 1976 and 1978 when she served as Vice President.  (D.E. No. 174-5, Ex. A ("Twomey Dep.") at 18:8-10, 19:12-19 & 20:9-11).  As President of the Union,

---

[2]     The Court distills these facts from the parties' statements of material facts, affidavits, and exhibits accompanying the pending motions for summary judgment.  Unless otherwise noted, these background facts are undisputed.  Additional facts are provided elsewhere in this Opinion as relevant to the Court's analysis.

[3]     *Beck* objectors are employees who decline to become union members but are still required to pay a fee for the services they obtain through the union simply as a consequence of the work that the union does for those employees who are union members.  *See Comms. Workers of Am. v. Beck*, 487 U.S. 735, 744 (1988) (holding that the National Labor Relations Act does not require financial core members "to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment").

Twomey is involved in its decision-making, including the selection of legal counsel.  (D.E. No. 174-3, ("Fonti Cert.") ¶¶ 2-3).

*Nonparty Loccke.*  Loccke (an attorney) and Twomey began a professional relationship in the early 1980s, when the Union retained the law firm where Loccke worked.  (D.E. No. 174-8, Ex. D ("Loccke Dep.") at 14:17-22, 15:7-10; Twomey Dep. at 168:7-11, 182:20-22).  As a member of the Union's state executive committee, Twomey was involved in the selection of legal counsel for the Union.  (Twomey Dep. at 40:14-16, 158:5-9).  So, Twomey was one of the individuals involved in the selection of the firm where Loccke worked.  (D.E. No. 174-6, Ex. B at 8).  Loccke then formed his own firm in 1982 and has continued to perform legal work for the Union since his firm's formation.  (Loccke Dep. at 13:6-20, 19:11-17, 82:19-22, 93:22-94:4).  On occasion, the Union has solicited bids from other outside counsel, but Loccke's firm has never had to make a presentation or pitch to keep Union work.  (*Id.* at 82:23-83:3, 84:4-7).

Since 2002, Twomey and Loccke have both resided at a property owned by Loccke.  (*Id.* at 38:5-43:18, 45:4-11).  The purpose of the living arrangement is convenience.  (Twomey Dep. at 181:1-4; Loccke Dep. 42:14-43:2).  Twomey has never paid, offered to pay, nor has been asked to pay rent for living at Loccke's property.  (Twomey Dep. at 181:17-182:16; Loccke Dep. at 52:10-12).

*Nonparty Meadowlands Hospital.*  Meadowlands Hospital is a nonparty to this litigation.  (Defs. SMF ¶ 4).  It, however, is a signatory to three collective bargaining agreements with the Union and wrote a $25,000 check to Plaintiffs' current counsel (as payment of Plaintiffs' initial retainer fee in this lawsuit).[4]  (*Id.* ¶ 5; D.E. No. 176-17, Ex. 14 at 1).

---

[4]     The Court notes that Defendants point to evidence that Meadowlands Hospital made two separate $25,000 payments to Plaintiffs' counsel.  (Defs. SMF ¶¶ 22-23).  Plaintiffs, however, dispute the second $25,000 payment as being made in error.  (D.E. No. 184-3, ("Pls. Resp. SMF") ¶ 22-23).

### B.  The Retiree Healthcare Benefit Plan

In 2006, the Union proposed the retirement plan to employers.  (D.E. No. 176-13, Ex. 10 ("Slott Dep.") at 30:1-16).  When employers agreed to include the plan in future collective bargaining agreements, the employees in the affected bargaining units voted on whether their bargaining unit should participate in the plan.  (Defs. SMF ¶ 6).

Later in 2006, the American Arbitration Association administered a Ratification Election for the proposed retirement plan, where Union members voted on whether to adopt and contribute twenty cents per hour to it.  (D.E. No. 176-14, Ex. 11 ("Cert. of Results") at 3).  Union members could vote either yes, no, or abstain.  (Defs. SMF ¶ 8).  A majority of voting employees in eleven bargaining units favored participating in the plan.  (*Id.*).  As to Plaintiffs, Fonti voted for the plan; Rojas, Freemantle, and Hegarty voted against it; and Picogna abstained from voting.  (*Id.*).  The registered nurse bargaining unit at Palisades Hospital (where most of the Plaintiffs were employed at the time) adopted the plan by a 29-14 vote.  (*Id.*; Cert. of Results at 3).

Following the vote, the Union established the retirement plan, which was funded by employee payroll deductions.  (Defs. SMF ¶ 7).  Since 2007, Palisades Hospital and Meadowlands Hospital have been participating employers, and thus remit employee payroll deduction contributions to the plan.  (*Id.* ¶ 11).

Plaintiffs allege, however, that "prior to the vote, members were given insufficient and/or incorrect information concerning the details of the Plan by HPAE."  (D.E. No. 184-3, ("Pls. Resp. SMF") ¶ 6; *see also* D.E. No. 184-2 at 9-19).

### C.  Nonparty Meadowlands Hospital's Role in This Litigation

In August 2012, the Union filed a series of unfair labor practice charges with the NLRB against Meadowlands Hospital.  (Defs. SMF ¶ 15).  The Union alleged that Meadowlands Hospital

violated the National Labor Relations Act by threatening and surveilling the activities of its Union-represented employees and repudiating the terms and conditions of the parties' collective bargaining agreements. (*Id.*). As a result of the Union's allegations, the NLRB later issued a formal complaint against Meadowlands Hospital. (*Id.* ¶ 16). And, in October 2013, administrative proceedings were initiated before a NLRB administrative law judge. (*Id.*).

After commencing this action (but while still employed by Palisades Medical Center), Fonti met with Tamara Dunaev ("Dunaev"), one of the owners of Meadowlands Hospital. (Fonti Dep. 1 at 27:15-28:7). Fonti sought out Dunaev because she believed Dunaev to be more knowledgeable about law firms and "people." (*Id.* at 40:3-5). During their meeting (which occurred prior to the filing of the SAC), Fonti expressed to Dunaev an unease with her then-attorney. (*Id.* at 28:8-17). Specifically, Fonti stated that her lawsuit was beginning to get more complicated and that she feared her then-attorney could not handle its growing complexity. (*See id.* at 39:10-14). An attorney present during their meeting then suggested that Fonti contact the law firm that currently represents Plaintiffs. (*Id.* at 43:12-18; D.E. No. 176-7, Ex. 5(c) ("Fonti Dep. 3") at 158:13-16).

On January 28, 2014, Meadowlands Hospital wrote a $25,000 check to Plaintiffs' current counsel, as payment of Plaintiffs' initial retainer fee in this lawsuit. (D.E. No. 176-17, Ex. 14 at 1). And on February 11, 2014, Fonti entered into a retainer agreement with Plaintiffs' current counsel. (D.E. No. 176-18, Ex. 15 at 1). By April 1, 2014, the other Plaintiffs also signed a retainer agreement. (D.E. No. 176-19, Ex. 16 at 1-9). On January 30, 2014, two days after receiving the check from Meadowlands Hospital, Plaintiffs' counsel filed a substitution of attorney in this case. (D.E. No. 27). On February 19, 2014, Fonti sought leave to file the SAC, which added the Count IV allegations against Twomey. (D.E. No. 34).

6

Before the $25,000 payment, Dunaev and Fonti communicated by email regarding the substance of claims that were eventually added to the SAC (i.e., Count IV).  (*See* D.E. No. 199-3, Ex. B ("Rebhorn Ex. B") at 1-13.  Dunaev, in turn, forwarded those emails to James McQueeny ("McQueeny"), an owner of a public relations company hired by Meadowlands Hospital.  (*Id.*).  Moreover, Fonti's and Dunaev's conversations and emails were occurring while Meadowlands Hospital was experiencing a "complex business relationship" with the Union.  (D.E. No. 176-10, Ex. 8 ("Dunaev Dep.") at 252:8-12).

### D.  Fonti's Website and Facebook Page on Twomey

Fonti created a website called "Boss Twomey's Family" and a Facebook page entitled "Nurses Against Union Abuse."  (D.E. No. 185-6, ("Def. Twomey's SMF") ¶ 6; D.E. No. 185-1, Ex. C ("Facebook Page")).  The Facebook Page is about "concerned nurses who want to shine a light on the greedy, unethical behavior of HPAE Union Boss Ann Twomey and the rest of union leadership."  (Facebook Page).  The website and Facebook Page state that Twomey "spends union funds on her live-in attorney boyfriend."  (Def. Twomey's SMF ¶ 9).  Moreover, the Facebook Page states, "We are protesting the nondisclosure of over a [] million dollars in dues to [Twomey's] live-in boyfriend lawyer."  (*Id.* at 10; Facebook Page).  Fonti further wrote that this relationship "[b]y law [] had to be reported and was not."  *Id.*

### E.  Procedural History

Fonti initiated this law suit on May 17, 2013, in the Superior Court of New Jersey.  (D.E. No. 1-1 at 7-17).  On July 10, 2013, Defendants removed the case to federal court.  (D.E. No. 1).  On July 11, 2014, Plaintiffs Picogna, Rojas, Freemantle, and Hegarty were added to this action.  (D.E. Nos. 43 & 49).  On July 14, 2014, Plaintiffs filed the SAC alleging (i) clarification of rights under plan and for past and future benefits pursuant to ERISA § 1132(a)(1)(B) (Count I); (ii)

breach of fiduciary duty for failing to disclose plan language and issue a summary plan description in a timely manner and abide the terms of the plan (Count II); (iii) breach of fiduciary duty (Count III); and (iv) breach of fiduciary duty under 29 U.S.C. § 501(a) against Twomey (Count IV).  (*See* SAC).

In response, Twomey asserted a Counterclaim for defamation against Fonti.  (Counterclaim at 15-21).  Twomey alleges, among other things, that the Internet sites (i) misrepresent facts regarding Twomey's decision-making and compensation; and (ii) falsely stated that Twomey is guaranteed a pay raise, meal allowance, car allowance, and free health insurance benefits from the Union.  (*Id.* at 17).

The parties completed discovery on March 31, 2016.  (D.E. No. 150).  On June 17, 2016, Fonti moved for summary judgment on Twomey's Counterclaim.  (D.E. No. 173-1, ("Fonti's Mov. Br.")).  Twomey opposed Fonti's motion.  (D.E. No. 185, ("Twomey's Opp. Br.")).  And Fonti replied to Twomey's opposition.  (D.E. No. 196, ("Fonti's Reply Br.")).

Also on June 17, 2016, Plaintiffs moved for summary judgment on Count IV of the SAC.  (D.E. No. 174-1, ("Pls. Count IV Mov. Br.")).  Defendants opposed Plaintiffs' motion.  (D.E. No. 186, ("Defs. Count IV Opp. Br.")).  And Plaintiffs replied to Defendants' opposition.  (D.E. No. 197, ("Pls. Count IV Reply Br.")).

Finally, on the same day, June 17, 2016, Defendants also moved for summary judgment on Counts III and IV of the SAC.  (D.E. No. 183-2, ("Defs. Mov. Br.")).  On July 18, 2016, Plaintiffs opposed Defendants' motion.  (D.E. No. 184, ("Pls. Opp. Br.")).  And on August 10, 2016, Defendants replied to Plaintiffs' opposition.  (D.E. No. 206, ("Defs. Reply Br.")).

## II.    LEGAL STANDARD

Summary judgment is appropriate under Federal Rule Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact, and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).[5]  "[S]ummary judgment is essentially put up or shut up time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003).  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

---

[5]    Unless otherwise indicated, all internal citations and quotation marks are omitted, and all emphasis is added.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e)(2) (requiring the nonmoving party to "set out specific facts showing a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Casualty & Surety Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Finally, "[t]he summary judgment standard does not change when . . . the parties have filed cross-motions for summary judgment." *Wimberly Allison Tong & Goo, Inc. v. Travelers Prop. Casualty Co. of Am.*, 559 F. Supp. 2d 504, 509 (D.N.J. 2008) (*citing Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987), *aff'd* 352 F. App'x 642 (3d Cir. 2009). "Such motions are no more than a claim by each side that it alone is entitled to summary judgment . . . ." *Transportes Ferreos de Venez. II Ca v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001).

### III.  DISCUSSION

#### A.  Count III: Defendants' Motion for Summary Judgment

##### i.  The Parties' Arguments

Defendants move for summary judgment on Count III on several grounds.  (*See* Defs. Mov. Br. at 7-14).  First, Defendants argue that the LMRDA's prohibition against "interested employer" financing of members' litigation against their union requires dismissal.  (*Id.* at 7-10).  Defendants then characterize the allegations in Count III as alleging a breach of the duty of fair representation and argue that Plaintiffs' allegations fail as a matter of law because (i) the claims are time-barred; and (ii) Plaintiffs cannot show a causal connection between the Union's alleged misrepresentations and the adoption of the plan.  (*Id.* at 11-15).  Finally, Defendants argue that even if the Court construes Plaintiffs' claims in Count III to allege breach of fiduciary duties under ERISA, Count III must nevertheless be dismissed because the Union and Twomey—the only remaining Defendants in the case—are not trustees or administrators of the plan and thus have no role that would subject them to ERISA fiduciary obligations.  (*Id.* at 12 n.4).

Plaintiffs counter that the "interested employer" prohibition of the LMRDA does not apply because Plaintiffs' allegations in Count III assert a breach of fiduciary duty against the Union and Twomey pursuant to ERISA, not the LMRDA.  (Pls. Opp. Br. at 11).  In response to Defendants' interpretation of the allegations in Count III as alleging a breach of the duty of fair representation, Plaintiffs note that they "have not alleged a breach of the duty of fair representation claim."  (*Id.* at 19).  Indeed, Plaintiffs point out that their "Second Amended Complaint makes no reference to any breach of the duty of fair representation claims—because Plaintiffs have not asserted any." (*Id.* at 21).  Finally, in response to Defendants' alternative argument, Plaintiffs maintain that Defendants (i) triggered fiduciary duties under ERISA when the Union educated its members about

11

the terms of the proposed plan and as a result of Twomey's alleged involvement in devising the plan (and are thus fiduciaries under the ERISA framework); and (ii) breached those duties when they affirmatively misrepresented and omitted numerous material facts to Union membership. (*Id.* at 23-24).

### ii. Analysis

As a preliminary matter, the Court notes that it will construe Plaintiffs' claims in Count III as alleging a breach of fiduciary duty pursuant to ERISA. Count III refers to "trustees" and Union officers making misrepresentations and failing to disclose information in both a corporate and "ERISA capacity" to Union membership prior to and after soliciting votes for the retirement plan. (SAC ¶¶ 46-56). The Court is unpersuaded by Defendants' unsupported assertion that the "only fiduciary duty imposed on Defendant Twomey as President of HPAE is found in Section 501(a) of the LMRDA." (Defs. Mov. Br. at 10). And, as Plaintiffs correctly note, Defendants fail to address the Union's fiduciary duties to its members despite the fact that Count III is also alleged against the Union. (Pls. Opp. Br. at 11-12). As such, because the "interested employer" defense is inapplicable to non-LMRDA claims (here, an ERISA claim), Defendants' "interested employer" defense does not apply to the Court's analysis of Count III. *See Simo v. Union Needletrades*, 322 F.3d 602, 612 (9th Cir. 2003) (explaining that employer encouragement of lawsuit would bar claims brought under LMRDA, but not claims falling under other federal or state law).[6]

---

[6] Moreover, Defendants interpret Plaintiffs' allegations in Count III as a breach of the "duty of fair representation." (Defs. Mov. Br. at 11-12). Plaintiffs, however, maintain that Count III is not a claim for a breach of the duty of fair representation. (Pls. Opp. Br. at 19). Accordingly, Plaintiffs have not opposed the substance of Defendants' argument that, if Count III alleges a breach of HPAE's duty of fair representation, Count III fails as a matter of law. (*See generally id.*).

Plaintiffs assert that their claims in Count III "are based on misrepresentations and omissions made in connection with the establishment of a retiree medical benefit plan." (*Id.* at 20). They note that their SAC "makes no reference to any breach of the duty of fair representation claims—because Plaintiffs have not asserted any." (*Id.* at 21). In light of Plaintiffs' assertions in their opposition and because Plaintiffs have declined to present any substantive opposition to Defendants' motion for summary judgment on the duty of fair representation, the Court notes that any

To resolve Defendants' motion for summary judgment on Count III, the Court will therefore focus on Defendants' argument that "[e]ven if the allegations in Count III could be considered under ERISA, rather than the duty of fair representation, they would fail as a matter of law." (Defs. Mov. Br. at 12 n.4). In other words, the Court will evaluate Defendants' argument that the "undisputed facts establish that HPAE and Twomey . . . play no role in relation to the plan that would subject them to fiduciary obligations under ERISA." (*Id.*).

### a. Breach of a Fiduciary Duty under ERISA

A claim for breach of fiduciary duty under ERISA may be premised on either a misrepresentation or an omission. *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009). To establish such a breach, a plaintiff must demonstrate that (i) the defendant was acting in a fiduciary capacity; (ii) the defendant made affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries; (iii) the misrepresentation or inadequate disclosure was material; and (iv) the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure. *Id.*

The first element may be established in two ways. First, a person is a fiduciary if the ERISA plan explicitly identifies them as such. *See* 29 U.S.C. § 1102(a).

Second, ERISA also provides that:

> (A) person is a fiduciary with respect to a plan to the extent
>
> (i)   he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
>
> (ii)  he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

---

such claim has been abandoned. *Desyatnik v. Atlantic Casting & Engineering Corp.,* No. 03-544, 2006 WL 120163, at *1 (D.N.J. Jan. 17, 2006) ("[W]hen a party fails to offer any argument or evidence in opposition to defendants' motion for summary judgment, such claims may be deemed to have been abandoned.").

> (iii)    he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A).

In other words, "to be a fiduciary within the meaning of § 1002(21)(A), a person must act[] in the capacity of manager, administrator, or financial advisor to a plan." *Santomenno ex rel John Hancock Trust v. John Hancock Life Ins. Co.*, 768 F.3d 284, 291 (3d Cir. 2014). This "functional fiduciary duty is contextual—it arises only to the extent a person acts in an administrative, managerial, or advisory capacity to an employee benefits plan." *Id.*; *see also Walling v. Brady*, 125 F.3d 114, 119 (3d Cir. 1997) (stating that a person is subject to ERISA fiduciary duties only to the extent the person "exercises any discretionary authority or discretionary control respecting" plan management or plan administration). "Because an entity is only a fiduciary to the extent it possesses authority or discretionary control over the plan," the dispositive question is "whether [the entity] is a fiduciary with respect to the particular activity in question." *Renfro v. Unisys Corp.,* 671 F.3d 314, 321 (3d Cir. 2011).

### b. Twomey Was Not a Fiduciary Under ERISA

To resolve Defendants' motion for summary judgment on Count III, the Court must determine, as a threshold matter, whether an issue of material fact exists as to Twomey's fiduciary status under ERISA. *See In re Unisys Corp.*, 579 F.3d at 228. Although the parties agree that Twomey is neither a trustee nor an administrator of the retirement plan (*see* Defs. SMF ¶ 30; Pls. Resp. SMF ¶ 30), Plaintiffs contend that Twomey was an ERISA fiduciary pursuant to 29 U.S.C. §1002(21)(A). (*See* Pls. Opp. Br. at 23).

The Court finds that there are no genuine issues of material fact as to whether Twomey is a fiduciary under ERISA. In opposition to Defendants' motion, Plaintiffs point the Court only to

14

the Union's efforts to "educate" Union members about the terms of the proposed retirement plan and to Twomey's alleged involvement in devising the plan.  (*Id.*)  Both grounds, however, are not sufficient to trigger Twomey's fiduciary obligations under ERISA.

While Plaintiffs allege that the Union educated its members about the terms of the plan, they have not provided the Court with specific citations to the record demonstrating that Twomey performed this function.  (*See id.* at 22-23).  Plaintiffs' record citations support only the proposition that the Union may have acted as a fiduciary.  (*See* Slott Dep. at 94:2-25; 196:14-16).  In fact, Plaintiffs' record cites do not pertain to Twomey at all, but rather simply discuss the Union's efforts to educate union membership about the plan.  (*See id.*; Pls. Opp. Br. at 23 ("[N]ot only did Twomey and others involved in HPAE's leadership devise the concept of the retiree medical benefits plan, HPAE subsequently concededly undertook to 'educate' union members about the terms of that proposed plan.")).  Thus, even if educating Union members on the proposed plan was sufficient to impose an ERISA fiduciary obligation, Plaintiffs have failed to carry their burden of coming forward with specific facts to indicate that Twomey educated Union members about the proposed plan.

Moreover, to the extent Plaintiffs rely on the allegation—not supported by any citation to the record—that Twomey and others triggered ERISA fiduciary obligations because they "devise[d] the concept of the retiree medical benefits plan" (Pls. Opp. Br. at 23), this argument likewise fails.  An employer or its representative is not a "fiduciary of a benefits plan merely because it creates, sponsors or contributes to a plan." *Trustees of Health & Welfare v. Schlesinger Bros.*, 931 F. Supp. 204, 207 (S.D.N.Y. 1996) (holding that defendant was only "a plan designer and, as such, does not fall within the parameters of ERISA liability as a fiduciary" (*Id.* at 208)); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) (observing that "a plan sponsor

does not become a fiduciary by performing settlor-type functions such as establishing a plan and designing its benefits"). Thus, the allegation that Twomey devised the concept of the retirement plan is not enough, on its own, to raise a genuine issue of material fact as to whether Twomey had fiduciary duties under ERISA.

Plaintiffs therefore have not provided a basis to support a claim against Twomey for breach of fiduciary duty pursuant to ERISA. Accordingly, the Court will grant summary judgment on Count III in favor of Twomey.

### c. *The Union Was Not Fiduciary Under ERISA*

Similarly, to resolve Defendants' motion for summary judgment on Count III, the Court must determine whether an issue of material fact exists as to the Union's fiduciary status under ERISA. *See In re Unisys Corp.*, 579 F.3d at 228. Since the parties agree that the Union is neither a trustee nor an administrator of the plan, the Union is therefore not a fiduciary pursuant to 29 U.S.C. § 1102(a). (*See* Defs. SMF ¶ 30; Pls. Resp. SMF ¶ 30). Instead, Plaintiffs insist that the Union was an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A) because it "educat[ed]" Union membership about the terms of the proposed plan prior to their vote. (*See* Pls. Opp. Br. at 23). In essence, Plaintiffs' argument is that the Union's efforts to educate Union membership about the terms of the proposed plan was the kind of discretionary act that triggered its fiduciary obligations under ERISA, "because ERISA provides that any person may engage in discretionary acts in respect of a plan and thereby assume fiduciary duties." (*Id.* (citing *Adamczyk v. Lever Bros. Co.*, 991 F. Supp. 931, 937 (N.D. Ill. 1997))). The Court is unpersuaded by Plaintiffs' argument.

Generally, courts have imposed ERISA fiduciary duties on employers when they serve as administrators of an ERISA plan and explain "plan benefits and business decisions about plan benefits to [their] employees." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 492 (3d Cir. 2000);

16

*see also Varity Corp. v. Howe,* 516 U.S. 489, 502 (1996) (stating that employer who was also administrator of a plan acted as ERISA fiduciary when it "conveyed information about the likely future of plan benefits"); *Bouboulis v. Transport Workers of Am.*, 442 F.3d 55, 65 (2d Cir. 2006) (imposing fiduciary status on employer who made assurances regarding plan benefits to its employees because it was also the plan's administrator and employees could have reasonably believed that labor union was communicating to them as both employer and administrator).  These holdings, however, are supported with facts from which "[r]easonable employees might not have distinguished consciously" when their employer or labor union was communicating with them "in its capacity as employer and in its capacity as plan administrator." *Varity Corp.*, 516, U.S. at 503.

Here, the Union's effort to explain the terms of the proposed plan is—by itself— insufficient to trigger ERISA fiduciary duties.[7]  The Union is Plaintiffs' collective bargaining representative, not their employer or the plan administrator.  As such, Plaintiffs cannot impose a fiduciary obligation on the Union on this basis alone.  *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 553 (6th Cir. 2012) (rejecting plaintiffs' claims to impose fiduciary status on their union on the theory that the union explained plan benefits because union was not the employer and plaintiffs could not have reasonably thought that the union was acting as plan administrator).  And Plaintiffs point to no facts from which they could have "reasonably believed that [the Union] was acting in the capacity of a plan administrator when it allegedly made" misrepresentations and omissions. *Id.*  Indeed, Plaintiffs have not provided any support for the proposition that the mere explanation

---

[7]      The Court notes that the Union was the retirement plan's sponsor.  (Defs. Mov. Br. at 12).  As the plan's sponsor, however, the Union is not automatically subject to ERISA fiduciary duties.  *See Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1158 (3d Cir. 1990) ("The plan administrator owes a fiduciary duty to the plan participants; the plan sponsor, as long as it is not acting as an administrator, generally does not.").  In any event, Plaintiffs do not contend that the Union's status as the plan's sponsor played any role in triggering fiduciary duties under ERISA.  (*See generally* Pls. Opp. Br.).

of the proposed terms of the retirement plan, without more, constitutes the discretionary authority or responsibility over a plan necessary to trigger the fiduciary duties under ERISA. *See Teamsters Local Union No. 469 v. Teamsters Joint Council No. 73 Pension Fund*, No. 14-7466, 2015 WL 5603656, *3 (D.N.J. Sept. 22, 2015) ("Labor unions cannot be fiduciaries when they do not have or exercise any authority or control over a benefit plan.").

The Court is not persuaded by Plaintiffs' only authority in support of their argument: *Adamczyk*, 991 F. Supp. at 931. In *Adamczyk*, the plaintiffs voluntarily retired from the defendant's employment under an ERISA plan. *Id.* at 933, 935 n.1. Soon after their retirement, the defendant-employer announced a new ERISA retirement plan that offered retirement to its employees on terms more favorable than those offered to the plaintiffs. *Id.* The plaintiffs then argued that the defendant-employer breached its ERISA fiduciary duties because it misled them regarding its intention to introduce the new ERISA retirement program. *Id.* at 933.

Plaintiffs' reliance on *Adamczyk* is misplaced. First, that decision resolved a pre-discovery motion to dismiss, not a post-discovery summary-judgment motion. *Id.* at 938 ("Whether defendant acted as a fiduciary in this case is a question of fact that must await further development of the factual record."). And, unlike here, the *Adamczyk* court noted that the employer's delegation of administrative authority over the plan was unclear. *Id.* at 935 n.1. Here, it is undisputed that the Union was neither the administrator of the plan nor Plaintiffs' employer.

Given this backdrop, the Court will grant Defendants' motion on Count III in favor of the Union because "there is no basis for [P]laintiffs to have reasonably believed that [the Union] was acting in the capacity of a plan administrator when it allegedly made" misrepresentations and omissions. *Cataldo*, 676 F.3d at 553.

18

### B.  Count IV: The Parties' Motions for Summary Judgment

#### i.  The Parties' Arguments

Both parties move for summary judgment on Count IV—Twomey's alleged breach of her fiduciary duty to the Union under the LMRDA, 29 U.S.C. § 501(a).  Defendants argue, in part, that Count IV of Plaintiffs' SAC should be dismissed because it violates a prohibition under the LMRDA against "interested employer" financing of union member lawsuits against their union. (Defs. Mov. Br. at 2).  They further argue that Count IV should be dismissed because Plaintiffs have already received an accounting of the legal fees paid to Loccke's firm and still cannot prove such fees were excessive.  (*Id.* at 17).

In opposition to Defendants' motion, Plaintiffs counter that Count IV should not be dismissed because, although Meadowlands Hospital did pay Plaintiffs' retainer, the relief sought in Count IV is for the benefit of the Union.  (Pls. Opp. Br. at 17).  In other words, since Meadowlands Hospital ultimately gains nothing from the relief sought in Count IV, it cannot be an "interested employer."  (*Id.* at 15).

In their own motion for summary judgment on Count IV, Plaintiffs argue that "[t]he undisputed evidence in discovery demonstrates that Twomey violated § 501 of the LMRDA and breached her fiduciary duty to HPAE by living rent-free in Loccke's home while Loccke's Firm continued to perform hundreds of thousands of dollars of legal work for HPAE."  (Pls. Count IV Mov. Br. at 7).  Since Twomey breached her fiduciary duty to the Union, Plaintiffs ask—for the first time—that she disgorge the improper monetary benefit she received, that she provide a full disclosure about her rent-free living arrangement, and that she resign her position as president of the Union.  (*Id.*)

### ii.  "Interested Employer" Provision of the LMRDA

In 1959, Congress enacted the LMRDA to "correct widespread abuses of power and instances of corruption by union officials." *Franza v. Int'l Brotherhood. of Teamsters, Local 651*, 869 F.2d 41, 44 (2d Cir. 1989).  In the LMRDA, Congress specifically provided members of labor organizations with a bill of rights.  *See* 29 U.S.C. § 411.  Among those rights "is the right of a union member to bring an action against his union and its leaders in court or before an administrative agency."  *Int'l Union v. Nat'l Right to Work Legal Def. & Educ. Found.*, 590 F.2d 1139, 1149 (D.C. Cir. 1978).  This right-to-sue provision in 29 U.S.C. § 411 "was designed to give union members the tools to insure the effective and fair operation of their union as a representative institution."  *Id.*

A union member's right to sue, however, is limited: "[N]o interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition."  29 U.S.C. § 411 (a)(4).  In other words, a union member's right to sue her union is limited where an interested employer finances, encourages, or participates in the action.  *Id.*

Congress enacted this limitation "to protect unions from harassing litigation and illegal management interference with their internal disputes with dissident workers."  *Int'l Union v. Nat'l Right to Work Legal Defense & Educ. Found.*, 66 F. Supp. 46, 48 (D.C.C. 1974); *see also Int'l Union*, 590 F.2d at 1149 (stating that the limitation "was designed to keep employer influence out of disputes between union members and their unions").  In essence, "Congress wanted to deny employers with the power to cause harassing suits or otherwise to create divisions in the unions with which they had relationships."  *Int'l Union*, 590 F.2d at 1151; *see also Loc. Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73, 84 (2d Cir. 2003) (explaining that since

the limitation "seeks to deny interested employers the power to cause harassing suits or create divisions between the union and its members, that concern is mitigated where the union has already initiated legal action against one or more of its members").

An employer is interested in litigation if it has a "share or concern in the litigation, liable to be affected by it." *Adamszewski v. Int'l Ass'n of Machinists & Aerospace Workers*, 496 F.2d 777, 784 (7th Cir. 1974). A determination that an employer is concerned with, liable to be affected by, or has some self-interest in the litigation is necessarily dependent on "the factual context which gave rise to the litigation." *Id.* If the factual context of the litigation indicates that the employer stands to gain not only from the outcome of the litigation but also from initiating the litigation itself, then the employer is interested and, therefore, cannot finance, encourage, or participate in a union member's suit. *See id.* (finding that the employer was interested because the plaintiff's requested remedy would influence the employer's future bargaining strategy and because the employer would stand to gain from any divisiveness within the union); *Colapierto v. Int'l Ass'n of Machinists & Aerospace Workers*, 611 F. Supp. 90, 95 (D.R.I. 1985) (finding that employer was interested because it was a "classic setting in which an employer be motivated to encourage suits by its employees against their union").

The remedy for violation of the "interested employer" provision is dismissal of the claims brought under the LMRDA. *See Harris v. Plasterers & Cement Masons Local*, 619 F.2d 1164, 1170 (7th Cir. 1980) (dismissing an LMRDA suit against a union because, among other reasons, it was "encouraged by an interested employer"); *Adamszewski,* 496 F.2d at 784-85; *Colapietro*, 611 F. Supp. at 95-96 (holding that where employer financed an LMRDA suit, the court had "no alternative but to dismiss the complaint").

### iii.  Meadowlands Hospital is an Interested Employer

Defendants argue that the Court should grant their motion on Count IV because Meadowlands Hospital is an "interested employer" and "Meadowlands Hospital has been the sole financial contributor to Plaintiffs' legal . . . fees from January 2014 to the present time."  (Defs. Mov. Br. at 8-9).  Specifically, Defendants argue that Meadowlands Hospital is interested because it is "(i) an employer of HPAE members, (ii) an adversary of HPAE in a serious and ongoing labor dispute, (iii) the subject of proceedings initiated by the Union against it before the NLRB, and (iv) a participating employer in the retiree health plan that is the basis for this lawsuit."  (*Id.* at 8).  Defendants also note that Meadowlands Hospital has provided Plaintiffs with at least $25,000 to retain Plaintiffs' current legal counsel—which is the only compensation Plaintiffs' counsel has received in this litigation.  (D.E. No. 176-17, Ex. 14 at 1).  The Court agrees.

The parties do not dispute that Meadowlands Hospital paid at least $25,000 of Plaintiffs' retainer, the sole source of legal fees for Plaintiffs' counsel.  (Defs. SMF ¶¶ 19-20; Pls. Resp. SMF ¶¶ 19-20).  Thus, it is undisputed that Meadowlands Hospital has, at least, "finance[d]" this litigation.  *See* 29 U.S.C. § 411(a)(4).  Although Plaintiffs do not dispute that Meadowlands Hospital is the only source of legal fees for Plaintiffs' counsel, Plaintiffs dispute that Meadowlands Hospital is "interested" within the meaning of 29 U.S.C. § 411(a)(4).  (Pls. Opp. Br. at 13-18).  Construing the term narrowly, Plaintiffs argue that Meadowlands Hospital is not "interested" because it has no interest in what is at stake in the case.  (*Id.* at 15).  According to Plaintiffs, their claim under 29 U.S.C. § 501(b) is brought "for the benefit of the union . . . to halt Twomey's ongoing breaches of her fiduciary duty."  (*Id.* at 17).  Thus, since the Union would be the only beneficiary of any favorable judgment on Count IV, Meadowlands Hospital is not an "interested" employer under 29 U.S.C. § 411 (a)(4).  (*Id.*).

Though persuasive, Plaintiffs' argument misses the point.  Determining whether an employer has a "share or concern in the litigation, liable to be affected by it" is not constrained by whom ultimately receives the benefits of a favorable judgment.  *Adamszewski*, 496 F.2d at 784 (rejecting plaintiffs' argument that employer was not interested because it had "no legal, financial or business advantage" gained by the suit (*id.* at 781)); *see also Colapietro*, 611 F. Supp. at 95 (rejecting the argument that employer was not interested because it would neither gain nor lose anything from the plaintiffs' suit).  Rather, the proper inquiry is whether the "factual context which gave rise to the litigation" demonstrates that the employer is concerned with, liable to be affected by, or has some self-interest in the litigation.  *Adamszewski*, 496 F.2d at 784 (finding that employer was interested because litigation would influence employer's bargaining strategy or create divisiveness within the union and weaken representational strength); *see also Harris*, 619 F.2d at 1170 (finding that employer was interested in the litigation because it promised to pay the union fines plaintiffs were then litigating); *Colapierto*, 611 F. Supp. at 95 (finding employer to be interested in litigation because of its drawn out conflict with the defendant union).

Here, in light of the factual context giving rise to Count IV, the Court finds that no genuine issues of material fact exist regarding whether Meadowlands Hospital is concerned with, liable to be affected by, or has some self-interest in this litigation.  *See Colapierto*, 611 F. Supp. at 95.

Meadowlands Hospital and one of its co-managers, Dunaev, began to play an important role in this litigation between June 5, 2013 (the filing of the first amended complaint) and July 14, 2014 (the filing of the SAC).  (*See* Defs. SMF ¶ 17; Fonti Dep. 1 at 27:24-28:7).  In a meeting that occurred before the filling of the SAC, Fonti expressed to Dunaev an unease with her then-attorney.  (Fonti Dep. 1 at 28:8-17).  Fonti explained that her lawsuit was beginning to get more complicated and that she feared her then-attorney could not handle its growing complexity.  (*See*

*id.* at 39:10-14).   Although Dunaev never suggested what law firms were available to Fonti, an attorney present during their meeting suggested that Fonti contact the law firm that currently represents Plaintiffs.   (Fonti Dep. 1 at 43:12-18; Fonti Dep. 3 at 158:13-16).

Notably, Dunaev and Fonti also corresponded by email regarding the substance of Count IV.   (*See* Rebhorn Ex. B at 1-13).   On June 3, 2013, for example, Fonti forwarded to Dunaev an email she received from Twomey in 2008 regarding the Union's conflict-of-interest policy.   (*Id.* at 2).   Dunaev, in turn, forwarded that email to McQueeny (an owner of a public relations company hired by Meadowlands Hospital).   (*Id.*).   On June 12, 2013, Dunaev forwarded another email to McQueeny from Fonti, which described Twomey as a "greedy union" boss.   (*Id.* at 10-12).

On October 10, 2013, Dunaev sent another email to McQueeny.   (Dunaev Dep. at 229:19-21; D.E. No. 199-4, ("Rebhorn Ex. C) at 2).   This time, the email contained a link to the Department of Labor's website that concerned union members' conflict-of-interest filings.   (Dunaev Dep. at 231:17-232:9; Rebhorn Ex. C at 2).   Although it is unclear as to why, Dunaev testified that she spoke to McQueeny about whether Twomey breached her fiduciary duty by failing to report her rent-free living arrangement with Loccke.   (Dunaev Dep. at 231:17-232:11).   McQueeny then forwarded this email to a colleague stating, "It's even worse for [Twomey] here.   NO filings.   Talk in [A.M.]."   (Rebhorn Ex. C at 2).

Moreover, Fonti's and Dunaev's conversations and emails were occurring while Meadowlands Hospital was experiencing a "complex business relationship" with the Union. (Dunaev Dep. at 252:8-12).   The parties agree that, beginning in August 2012 and continuing until August 2013, the Union filed multiple unfair labor practice charges against Meadowlands Hospital.   (Defs. SMF ¶ 15; Pls. Resp. SMF ¶ 15).   The Union alleged that Meadowlands Hospital threatened and "surveill[ed] the union activities of its HPAE-represented employees and

repudiat[ed] the terms and conditions [of] the parties' collective bargaining agreements" in violation of the National Labor Relations Act. (*Id.*). In October 2013, administrative proceedings were then initiated before an NLRB administrative law judge. (*Id.*).

This is the factual context in which Meadowlands Hospital loaned $25,000 to Fonti to retain Plaintiffs' current counsel and add a LMRDA claim against Twomey. To be sure, when Meadowlands Hospital provided $25,000 to Plaintiffs' counsel, it was no secret that it was for Fonti's suit against Defendants. (*See* Dunaev Dep. at 61:1-62:7, 141:9-11). Although initially unaware of the loan's amount and purpose, Dunaev eventually understood that the $25,000—which Meadowland Hospital paid directly to Plaintiffs' counsel—was to facilitate Fonti's hiring of new attorneys for her lawsuit against Defendants. (*Id.*).

Then, on January 30, 2014, two days after receiving the check from Meadowlands Hospital, Plaintiffs' counsel filed a substitution of attorney in this case. (D.E. No. 27). On February 19, 2014, Fonti sought leave to file the SAC, which added the Count IV allegations against Twomey. (D.E. No. 34).

Thus, no genuine issue of material fact exists as to whether Meadowlands Hospital is an "interested employer." Here, as in *Colapietro*, Meadowlands Hospital and the Union were in the midst of a labor dispute. (Defs. SMF ¶ 15; Pls. Resp. SMF ¶ 15). And, like in *Colapietro*, the Court finds that "this is the classic setting in which an employer would be motivated to encourage suits by its employees against their union" because the Union filed multiple unfair labor practice charges against Meadowlands Hospital, causing the NLRB to initiate proceedings against it. *Colapietro*, 611 F. Supp. at 95.

Furthermore, although Count IV may be brought for the benefit of the Union (*see* Pls. Opp. Br. at 15), it nevertheless has "far greater implications." *Adamszewski*, 496 F.2d at 782. For

25

example, a finding that Twomey—who has served as Union president since 1978 (except for a two-year gap during which she was the Vice Precedent)—breached her fiduciary duty to the Union may cause her to lose the next election.  (Twomey Dep. at 18:4-19:25).  Indeed, Plaintiffs explicitly request the mandatory resignation from her position as President of HPAE.  (Pls. Opp. Br. at 30).  By seeking to dislodge the Union's longstanding president and "creat[e] divisions within the union," Count IV will "weaken the union's future bargaining power," which may redound to the benefit of Meadowlands Hospital.  *Adamszewski*, 496 F.2d at 782.

Plaintiffs' reliance on *Farowitz v. Associated Musicians* for the proposition that Meadowlands Hospital is not interested in this litigation is misplaced.  (Pls. Opp. Br. at 15-16 (citing 241 F. Supp. 895 (S.D.N.Y. 1965)).  In *Farowitz*, the court was persuaded by the fact that the union-member plaintiff was completely unaware of any participation by the alleged interested employer.  *Farowitz*, 241 F. Supp. at 908-09.  Here, the undisputed facts support the conclusion that Fonti was aware of Meadowlands Hospital and Dunaev's involvement in the lawsuit, and those nonparties were aware of the purpose of the $25,000 loan for legal fees (paid directly to Plaintiffs' counsel).  (*See* Dunaev Dep. at 61:1-62:7, 141:9-11, 260:1-262:25).

Given this backdrop, the Court grants summary judgment in favor of Defendants on Count IV, because it finds that there is no genuine issue of material fact as to whether Meadowlands Hospital is an interested employer who directly financed Plaintiffs' introduction of Count IV into this action.  Since the Court grants Defendants' motion on Count IV of the SAC, Plaintiffs' motion for summary judgment on the same count (D.E. No. 174) is denied as moot.

### C.  Fonti's Motion for Summary Judgment on Twomey's Counterclaim

#### i.  The Court May Lack Subject-Matter Jurisdiction

Fonti moved for summary judgment on Twomey's Counterclaim.  (D.E. No. 173).  The Court, however, is concerned that it lacks subject-matter jurisdiction over Twomey's Counterclaim for two reasons: (i) the Court is not entirely certain whether Twomey's Counterclaim is compulsory or permissive; and (ii) if the Counterclaim is permissive, the Court is not convinced that Twomey has asserted a proper independent basis for subject-matter jurisdiction pursuant to 28 U.S.C. § 1367(a).  For the reasons set forth below, the Court will order the parties to submit supplemental briefing on whether the Court has subject-matter jurisdiction over Twomey's Counterclaim.

Although the parties have not raised the issue, the Court must, on its own initiative, police the existence of subject-matter jurisdiction.  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("Subject-matter limitations on federal jurisdiction serve institutional interests. They keep the federal courts within the bounds the Constitution and Congress have prescribed.").  "Federal courts are not courts of general jurisdiction."  *Bender v. Williamsport Area Sch. District*, 475 U.S. 534, 541 (1986).  In order to adjudicate a claim, federal courts must have subject-matter jurisdiction.  *Id.*  "[B]ecause subject matter jurisdiction is non-waivable, courts have an independent obligation to satisfy themselves of jurisdiction if it is in doubt."  *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76-77 (3d Cir. 2003) (explaining that a court can raise *sua sponte* subject-matter jurisdiction concerns); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

How a counterclaim is characterized determines the requirements for establishing subject-matter jurisdiction.  Federal Rule of Civil Procedure 13 permits two kinds of counterclaims:

compulsory and permissive.  A counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."  Fed. R. Civ. P. 13(a)(1)(A).  By their nature, compulsory counterclaims does "not require an independent jurisdictional basis to be brought in federal court, even when it is purely a state-law claim."  *Wolfington v. Reconstructive Orthopaedic Associates. II*, No. 16-4935, 2016 WL 7411527, at *9 (E.D. Pa. Dec. 22, 2016) (citing *Ambromovage v. United Mine Workers of Am.*, 726 F.2d 972, 988 (3d Cir. 1984)).  Here, the Court is uncertain whether Twomey's Counterclaim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."  Fed. R. Civ. P. 13(a)(1)(A).

Alternatively, a counterclaim is permissive if it is a "claim that is not compulsory."  Fed. R. Civ. P. 13(b).  A permissive counterclaim "requires a basis for federal jurisdiction [that is] independent of the opposing party's claim."  *Wolfington*, 2016 WL 7411527, at *9 (citing *Aldens Inc v. Packel*, 524 F.2d 38, 52 (3d Cir. 1975)).  Here, Twomey's Counterclaim appears to be permissive because the thrust of the counterclaim does not appear to "[arise] out of the transaction or occurrence that is the subject matter of the" Plaintiffs' ERISA and the LMRDA claims.  Fed. R. Civ. P. 13(a)(1)(A); (*see* Counterclaim ¶¶ 7-8 (stating that Twomey alleges defamation based on comments Fonti made on the website and Facebook page)).  Indeed, Twomey appears to concede as much because she asserts that the Court has subject-matter jurisdiction over her Counterclaim based on 28 U.S.C. § 1367, the federal statute creating supplemental jurisdiction.  (*See* Counterclaim ¶ 1 (asserting that "[t]his Court has jurisdiction of this Counterclaim in accordance with 28 U.S.C. § 1367")).

Still, the Court is not certain that 28 U.S.C. § 1367 provides an independent basis for subject-matter jurisdiction over Twomey's Counterclaim.  Pursuant to § 1367, "in any civil action of which the district courts have jurisdiction, the district courts shall have supplemental jurisdiction

28

over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  The Supreme Court has explained, however, that "case or controversy" in § 1367 means that "[t]he state and federal claims must derive from a common nucleus of operative fact."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  Here, the "common nucleus of operative fact[s]" that supports Plaintiffs' claims under ERISA and LMRDA are separate and distinct from the facts supporting Twomey's Counterclaim for defamation.

Even if it is possible for a court to exercise supplemental jurisdiction pursuant to 29 U.S.C. § 1367, the Court may decline to exercise supplemental jurisdiction if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)-(4).  The Court is not convinced that, even if it had supplemental jurisdiction pursuant to § 1367(a), it should exercise supplemental jurisdiction over Twomey's Counterclaim.

Because the parties have not addressed whether the Court has subject-matter jurisdiction over Twomey's Counterclaim, the Court will order the parties to submit supplemental briefing addressing this issue.  Accordingly, the Court will reserve its determination of Fonti's motion for summary judgment on Twomey's Counterclaim.

### D.  Plaintiffs' Remaining Claims

Although not addressed by the parties, Counts I and II appear to be moot.  Count I, for example, alleges a "clarification of rights" pursuant to 29 U.S.C. § 1132(a)(1)(B).  (SAC ¶¶ 38-41).  District courts in this Circuit, however, hold that a proper defendant for a claim pursuant to 29 U.S.C. § 1132(a)(1)(B) is either the plan itself or the plan and its fiduciaries.  *See Hall v. Glenn O. Hawbaker, Inc.*, No. 06-1101, 2006 WL 3250869, at *9 (M.D. Pa. Nov. 8, 2006) (holding that the plan itself is the proper defendant); *Briglia v. Horizon Healthcare Serv., Inc.*, No. 03-6033, 2005 WL 1140687, at *5 (D.N.J. May 13, 2005) (holding that both the plan and its fiduciaries are proper defendants).  Here, the parties stipulated to the dismissal of both the plan administrator and the plan itself.  (*See* D.E. Nos. 195 & 203).  And, as noted above, neither the Union nor Twomey are fiduciaries of the plan.  Accordingly, since the proper defendants for Plaintiffs' claim under a 29 U.S.C. § 1132(a)(1)(B) have been dismissed by stipulation of the parties, Count I appears to be moot.

Similarly, the allegations in Count II focus on breaches of fiduciary duties by Defendant Benserco (as the plan administrator) and Defendants Slott, Johnson, and O'Hearn (as the plan's trustees).  (SAC ¶¶ 42-45).  Again, the parties have stipulated to the dismissal of these Defendants from this case.  (*See* D.E. Nos. 70, 193, 194 & 195).  Count II, therefore, also appears to be moot.

Accordingly, in their supplemental briefing, the parties shall also address the viability of Counts I and II.

### IV.   CONCLUSION

For the above reasons, the Court GRANTS Defendants' motion for summary judgment on Counts III and IV, DENIES Plaintiffs' motion for summary judgment on Count IV as moot, and

RESERVES its determination of Fonti's motion for summary judgment on Twomey's Counterclaim pending submission of the parties' supplemental briefing.

_s/Esther Salas_
**Esther Salas, U.S.D.J.**